IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DIEGO MATA-GONZALEZ, LILIA
LOPEZ-GUZMAN, VLADIMIR
MATA-LOPEZ, and JOHNNY
MATA-LOPEZ,

     Plaintiffs,

                               3:11-CV-260-PK

                               FINDINGS AND
                               RECOMMENDATION

v.

MIGUEL MONICO and CITY OF
CORNELIUS,

     Defendants.

PAPAK, Magistrate Judge:

On March 1, 2011, Diego Mata-Gonzalez ("Gonzalez"), his wife Lilia Lopez-Guzman

("Guzman"), and their two minor children Vladimir Mata-Lopez ("Vladimir") and Johnny Mata-

Lopez ("Johnny" and, collectively with Gonzalez, Guzman, and Vladimir, the "Gonzalez

Page 1 - FINDINGS AND RECOMMENDATION

family") brought this action against City of Cornelius Police Department employees Officer
Miguel Monico, Officer Jansen, Officer Dustin DeHaven, Officer Bruce Schmid, Sergeant Brian
Schmid, Sergeant Noffsinger, and Officer R. Venable, against the City of Cornelius, against 10
fictitiously named Doe defendants employed by the City of Cornelius Police Department (the
"Cornelius Doe defendants"), against Washington County, against Oregon Department of Human
Services employees Laurie Wuthrich and Heather Kitto, against 10 fictitiously named Doe
defendants employed by the Oregon Department of Human Services (the "DHS Doe
defendants"), against Washington County Sheriff's Office employees Deputy J. Hermann and
Deputy C. Bowman, and against 10 fictitiously named Doe defendants employed by the
Washington County Sheriff's Office (the "Washington County Doe defendants"). The parties'
dispute arises out of an incident of February 4, 2010, in which officers of the Cornelius Police
Department executed a warrant authorizing the search of the Gonzalez family's home for
weapons, a related incident of February 25, 2010, in which Vladimir and Johnny were removed
from their parents' custody, and a related incident of February 26, 2010, in which Gonzalez was
arrested for possession of a substance inaccurately identified by Cornelius law enforcement
personnel (chiefly Monico) as cocaine. By and through their complaint as filed, the Gonzalez
family alleged 21 separate claims against the named defendants arising out of those three
incidents.

On October 4, 2011, on the Gonzalez family's voluntary motion, the court dismissed from
this action all of the Washington County defendants, specifically Deputy Hermann, Deputy
Bowman, Washington County (including the Washington County Sheriffs Office and/or the
Washington County Department of Human Services) and the Washington County Doe

defendants. On May 30, 2012, upon the parties' joint stipulation, the court further dismissed from this action Wuthrich and Kitto.

The remaining named defendants moved for summary judgment as to all of the Gonzalez family's claims on November 15, 2012. In connection with their motion, the moving defendants asserted to the court that the plaintiffs had agreed to dismiss their claims to the extent alleged against any remaining defendant other than Monico or the City of Cornelius. In connection with their memorandum in opposition to defendants' dispositive motion, plaintiffs partially affirmed defendants' assertion, advising the court of their intent to abandon their claims to the extent alleged against defendants Jansen, DeHaven, Bruce Schmid, Brian Schmid, Noffsinger, and Venable, and seeking dismissal of their third, sixth, seventh, eighth, eleventh, fourteenth, and nineteenth enumerated claims.[1] Moreover, at oral argument in connection with defendants' motion for summary judgment, plaintiffs advised the court through their counsel of their intent further to abandon their claims to the extent alleged against the Cornelius Doe defendants and the DHS Doe defendants, and to abandon their tenth, fifteenth, sixteenth, twentieth, and twenty-first enumerated claims for relief. In addition, plaintiffs clarified through their counsel that their fifth enumerated claim for relief had been pled against defendant Monico in error, and was intended to be pled only against the City of Cornelius. Thus, following plaintiffs' voluntary winnowing of their own claims, those claims that remain at issue for purposes of defendants' pending dispositive motion are the following: (i) plaintiffs' first enumerated claim, alleging Monico's

_____

[1] The Gonzalez family simultaneously petitioned the court for appointment of Guzman as Vladmir and Johnny's guardian *ad litem*; the court granted the petition (impliedly *nunc pro tunc*) on January 14, 2013. In consequence, "plaintiffs" will hereinafter refer to Gonzalez, Guzman, and Guzman as guardian *ad litem* for Vladimir and Johnny.

liability under 42 U.S.C. § 1983 for arrest without probable cause in violation of Gonzalez'

Fourth Amendment rights; (ii) plaintiffs' second enumerated claim, alleging Monico's liability

under Section 1983 for malicious prosecution in violation of Gonzalez' Fourth and/or Fourteenth

Amendment rights; (iii) plaintiffs' fourth enumerated claim, alleging Monico's liability under

Section 1983 for violation of Gonzalez' right to substantive due process under the Fourteenth

Amendment; (iv) plaintiffs' fifth enumerated claim, alleging the City of Cornelius' liability under

Oregon common law for malicious prosecution of Gonzalez; (v) plaintiffs' ninth enumerated

claim, alleging Monico's liability under Section 1983 for violation of Guzman's right to

substantive due process under the Fourteenth Amendment; (vi) plaintiffs' twelfth enumerated

claim, alleging Monico's liability under Section 1983 for arrest without probable cause in

violation of Vladimir's Fourth Amendment rights; (vii) plaintiffs' thirteenth enumerated claim,

alleging Monico's liability under Section 1983 for violation of Vladimir's right to substantive due

process under the Fourteenth Amendment; (viii) plaintiffs' seventeenth enumerated claim,

alleging Monico's liability under Section 1983 for arrest without probable cause in violation of

Johnny's Fourth Amendment rights; and (ix) plaintiffs' eighteenth enumerated claim, alleging

Monico's liability under Section 1983 for violation of Johnny's right to substantive due process

under the Fourteenth Amendment.

Now before the court are remaining defendants Monico and the City of Cornelius' motion

(#64) for summary judgment as to all plaintiffs' remaining claims against them, defendants'

motion (#85) to strike certain portions of plaintiffs' opposition to defendants' summary judgment

motion, and plaintiffs' informal motion for judicial notice that all criminal charges against

Gonzalez in connection with his foredescribed arrest have been dismissed on their merits. I have

considered the motions, oral argument on behalf of the parties, and all of the papers and pleadings on file.  For the reasons set forth below, plaintiffs' third, sixth, seventh, eighth, tenth, eleventh, fourteenth, fifteenth, sixteenth, nineteenth, twentieth, and twenty-first enumerated claims for relief should be dismissed with prejudice, plaintiffs' informal motion for judicial notice should be granted as discussed below, defendants' motion (#85) to strike should be denied, and defendants' motion (#64) for summary judgment should be granted as to plaintiffs' fourth, ninth, twelfth, thirteenth, seventeenth, and eighteenth enumerated claims for relief and denied as to plaintiffs' first, second, and fifth enumerated claims for relief.

## LEGAL STANDARDS

I.      **Judicial Notice**

Federal Rule of Evidence 201(d) provides that "[a] court shall take judicial notice [of an adjudicative fact] if requested by a party and supplied with the necessary information." An adjudicative fact is subject to judicial notice when the fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b).

II.     **Motion to Strike**

A.      **Federal Civil Procedure Rule 12(f)**

Federal Civil Procedure Rule 12 provides that the district courts "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" on their own initiative or pursuant to a party's motion. Fed. R. Civ. P. 12(f). The disposition of a motion to strike is within the discretion of the district court. *See Federal Sav. & Loan Ins. Corp.*

*v. Gemini Management*, 921 F.2d 241, 244 (9th Cir. 1990).  Motions to strike are disfavored and

infrequently granted.  *See Stabilisierungsfonds Für Wein v. Kaiser, Stuhl Wind Distribs. Pty.,*

*Ltd.*, 647 F.2d 200, 201, 201 n.1 (D.C. Cir. 1981); *Pease & Curren Refining, Inc. v. Spectrolab,*

*Inc.*, 744 F. Supp. 945, 947 (C.D. Cal. 1990), *abrogated on other grounds by Stanton Road Ass'n*

*v. Lohrey Enters.*, 984 F.2d 1015 (9th Cir. 1993).

## B.    Inherent Power

It is well established that the district courts enjoy an inherent power to manage and

control their own dockets.  *See, e.g., Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (affirming

"the power inherent in every court to control the disposition of the causes on its docket with

economy of time and effort for itself, for counsel, and for litigants").  It is clear that this inherent

power includes the authority to sanction procedural impropriety in an appropriate manner.  *See,*

*e.g., Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991) (noting that "[a] primary aspect" of

the courts' inherent power "is the ability to fashion an appropriate sanction for conduct which

abuses the judicial process;" holding that because "outright dismissal of a lawsuit . . . is within

the court's discretion," in consequence less severe sanctions are "undoubtedly within a court's

inherent power as well"); *Atchison, T. & S.F. Ry. v. Hercules Inc.*, 146 F.3d 1071, 1074 (9th Cir.

1998) ("well established that district courts have inherent power to control their dockets and may

impose sanctions, including dismissal, in the exercise of that discretion") (citations, internal

quotation marks omitted); *see also Lamos v. Astrue*, 2008 U.S. App. LEXIS 9143 (9th Cir. 2008)

(unpublished disposition) (affirming inherent power of the courts to strike documents other than

pleadings from the docket); *Centillium Communs., Inc. v. Atl. Mut. Ins. Co.*, 2008 U.S. Dist.

LEXIS 20719 (D. Cal. 2008) (striking a procedurally improper motion pursuant to the court's

inherent power).

### III.    Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

### FACTUAL BACKGROUND[2]

### I.    The Parties

Gonzalez and Guzman, a married couple, immigrated to the United States from Mexico in 1986. Gonzalez speaks limited English, and Guzman none. Both are employed, and at all material times were employed. Gonzalez' and Guzman's son Vladmir was 13 years old at the time the complained-of incidents took place, and their son Johnny was nine.

Monico was at all material times an officer of the Cornelius Police Department, and is

---

[2] Except where otherwise indicated, the following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.

sued herein in his personal capacity. Monico was in charge of investigating charges of attempted murder against Gonzalez' and Guzman's eldest son Diego Mata-Lopez ("Diego Jr."), was involved in the complained-of search of the Gonzalez family's home, and was involved in the decisions leading to the complained-of arrest of Gonzalez and complained-of removal of Vladimir and Johnny from their parents' custody.

The City of Cornelius (the "City" or "Cornelius") is a municipality of the State of Oregon. Plaintiffs take the position that Cornelius is vicariously liable for the complained-of actions of its employees.

## II.   Factual Background Preceding the Complained-of Incidents

Gonzalez and Guzman have a documented history of domestic problems involving their eldest son, Diego Jr. While a minor, Diego Jr. ran away from home on more than one occasion, and Guzman called the Cornelius Police Department on one or more of these occasions. In addition, Diego Jr. had a police record indicating that he had been the victim of an assault and that he had been involved in minor acts of "trouble-making." During the period immediately preceding the incidents complained of in plaintiffs' complaint, Diego Jr. was not living in the Gonzalez family's home, and indeed Guzman refused to permit him to return to the home absent his agreement to certain conditions she set for him.

On January 27, 2010, a shooting took place in Cornelius resulting in one wounded victim struck in the leg with a .40 caliber bullet. The victim and other gang members Cornelius police officials believed were present during the shooting refused to cooperate with law enforcement investigation of the incident. However, two witnesses nevertheless identified Diego Jr. as having been involved in the shooting, despite the fact that neither of the two "witnesses" actually

observed the shooting first-hand. One of the two witnesses reported hearing Diego Jr. confess to the shooting on a speaker phone, and the other reported having been advised by an eyewitness that he saw Diego Jr. fire two shots in the air after initiating a confrontation with the shooting victim, following which the victim attempted to fire upon Diego Jr. unsuccessfully, due to a jammed gun. Apparently the eyewitness "ran away and hid" at that point, and did not observe any further sequelae. Other witnesses, who did not identify the shooter as Diego Jr., indicated to the contrary that the victim was the first to fire, and that the victim and the shooter exchanged fire until the victim was struck in the leg.

Based on the foredescribed testimony, Cornelius Police Department officials obtained a warrant to search the Gonzalez family's home (where Diego Jr. was not at that time a resident) for weapons and for forms of identification. The search warrant was obtained on the basis of a report authored by former defendant Jansen, and was executed on February 4, 2010.

### III.    Search of February 4, 2010

Prior to execution of the search warrant on February 4, 2010, former defendant Noffsinger stationed himself outside the Gonzalez family's residence to observe people entering or leaving. It appears that no Gonzalez family members were at the home at that time. After officers entered the home to begin searching, Vladimir arrived and asked Noffsinger what was going on. Noffsinger saw that Vladimir was carrying a notebook with "gang writing on it," and asked Vladimir to give it to him. Vladimir complied.

Monico was among the Cornelius law enforcement officials who conducted the search of the Gonzalez family's home. In the course of searching the home, Monico found a baggie of white powder in Guzman's dresser drawer together with some small paper cups. Monico also

noticed a shrine to various Catholic icons, including Santa Muerte.  In addition, Monico found a notebook he characterized as a "ledger" recording what he characterized as "drug-related" financial transactions, notwithstanding the fact that the notebook made no express or implied reference to any such transactions.

During the search, Monico allegedly conducted a field test for the presence of cocaine in the white powder found in the plastic baggie, using a NIK Narcotics "G" Field Drug Test Kit. This field test is a "presumptive" test, meaning that a positive result indicates that the substance tested for is probably present.  False positives are possible and, indeed, are not uncommon.  The test requires that three ampules containing chemicals be successively added to the substance being tested, and (according to the manufacturer of the test kit) a positive result is indicated where the mixture becomes "blue or pink with blue speckles" after the contents of the first ampule are added, "pink" after the contents of the second ampule are added, and "a pink layer over a blue layer" after the contents of the third ampule are added.  Although all three color changes are required, according to the manufacturer of the test kit, before a positive result is indicated, Monico's understanding of the test's operation was that a failure to turn blue following the mixture of the substance with the contents of the first ampule was immaterial to the outcome of the test.  Monico interpreted the results that he obtained as indicative of the presence of cocaine in the baggie.

Monico believed that cocaine dealers use small paper cups similar to those found near the baggie in Guzman's dresser to measure out cocaine to their customers, and on that basis determined that the presence of small paper cups suggested that a member of the Gonzalez family had been involved in transactions involving the sale of cocaine.  Monico also

characterized the presence of red-colored room decor and red-painted walls in the home as indicative of gang affiliation. Monico believed that Santa Muerte is considered "the patron saint of drug dealers" and that the "shrine" to Santa Muerte in the home was all but conclusive evidence that one or more members of the Gonzalez family were drug criminals. In addition, Monico found a bowl of M&M candies on the floor near a child's toy and a glass of water, which he believed constituted evidence of satanic ritual or gang-related religious observance.

Evidence seized from the home over the course of the search included a bloody sweatshirt and a 9 millimeter cartridge[3] with a dented primer. The person whose blood stained the sweatshirt has not been identified. Other than the foregoing, no evidence located at the residence indicated that drugs were used, packaged, or sold in that location. The house was well-kept and clean.

## IV.   Follow-Up to Search

Monico returned to the residence on February 4, 2010, after the search was complete, on the pretext that he might have left a notebook at the scene. When Monico returned to the scene, he spoke with Gonzalez in Spanish, which former defendant Jansen, who accompanied him, does not understand.

Speaking in Spanish, Gonzalez advised Monico that the white powder found in Guzman's dresser was not cocaine, but rather a soap made of eggshell powder used for cleansing prior to performance of religious ritual. Gonzalez showed Monico another baggie containing white powder, this one bearing a label identifying its contents as "cascarilla," a powder made largely of pulverized eggshell. Monico told Gonzalez that he (Monico) had "the power to do anything he

---

[3] The shooting in which Diego Jr. was a suspect involved a .40 caliber weapon.

wanted" notwithstanding Gonzalez' protestations of innocence, including the power to have
Gonzalez deported.  Gonzalez testified to his belief that Monico's purpose in returning to the
house after the search was to intimidate and threaten him.  Monico subsequently took the
position that, during his Spanish-language colloquy with Gonzalez, Gonzalez confessed to him
that the substance in the baggie had been cocaine, that the purported cocaine had been his own,
but that it was "old" and that he had "forgotten" that it was in the house.

Monico ultimately located the "missing" notebook in his own pocket.

Within a few days after the search warrant had been executed, Monico performed a
second test of the substance found in the baggie using the NIK Narcotics "G" Field Drug Test
Kit.  Jansen was present during this second test.  The second NIK test resulted in an outcome
similar to that obtained following the first such test.  The color change following addition of the
third ampule was very faint, and the blue color was barely visible.  Jansen believed that the
faintness of the colors obtained might indicate the presence of cocaine that had been "stepped on
repeatedly," or diluted with the addition of some non-narcotic substance.

Monico's report of the search indicated that children were present in a home found to
have contained cocaine, and that the children would potentially be subject to gang retaliation.
Monico further reported that one of the children, Vladimir, wore "gang" colors (by which he
meant red articles of clothing).

## V.    Removal of Vladimir and Johnny from their Parents' Custody on February 25, 2010

On the basis of Monico's report, on February 22, 2010, former defendant and Oregon
Department of Health Services employee Wuthrich contacted Monico regarding the possibility
that Vladimir and Johnny would be at risk of harm if left in their parents' custody.  Monico

testifies that he cooperated with the DHS investigation, but did not otherwise participate in any way. However, Monico called Wuthrich to follow up on his report and to confirm the possibility of potential danger to Vladimir. In addition, when Wuthrich went to the Gonzalez family's home on February 25, 2010, to interview Guzman, Monico accompanied her.

Prior to Wuthrich's arrival at the Gonzalez family's home, she had not yet made any determination as to what action to take in connection with the possible threat to the children's safety. When she arrived at the home accompanied by several police officers, including Monico, she noticed that Guzman became upset when she became aware of the presence of one specific police officer. She did not recall with specificity which officer it was whose presence triggered Guzman's emotional reaction. Guzman's response led Wuthrich to conclude that the allegations of criminal activity were correct, and on that basis she made the decision to remove Vladimir and Johnny from their parents' home. She took the children away and placed them in the foster care system, setting up a visiting schedule which would permit Guzman to visit them for one hour per week.

## VI.   Arrest of Gonzalez on February 26, 2010

On the basis of the white powder found in a plastic baggie near small paper cups, the presence of a baggie of marijuana (in connection with which no charges ever issued), the "shrine" to Santa Muerte, the presence of red objects in the house, the financial ledger, the results of the two field tests conducted on the white powder, the bloody sweatshirt and 9 millimeter cartridge, one or more children's notebooks with "gang-related" writing on them, and Monico's claim that Gonzalez had confessed that the white powder was his own cocaine rather than his wife's cascarilla, Monico obtained a warrant for Gonzalez' arrest for possession of cocaine with intent

to sell.  Monico arrested Gonzalez at his home on February 26, 2010.

Gonzalez was released from custody the following day, subject to the condition that he make no contact with his children and that he not return to his home while the charges against him were pending.

## VII.   Follow-Up to Arrest

In response to repeated requests by Gonzalez' lawyer, lab tests were ordered on the white powder seized from the Gonzalez family's home on April 15, 2010.  The results of those tests were returned on May 13, 2010.  The substance did not test positive for cocaine.  The criminal charges against Gonzalez were immediately dropped, and Vladimir and Johnny were returned to their parents that same day.

## ANALYSIS

## I.   Plaintiffs' Third, Sixth, Seventh, Eighth, Tenth, Eleventh, Fourteenth, Fifteenth, Sixteenth, Nineteenth, Twentieth, and Twenty-first Enumerated Claims

As noted above, in connection with their opposition to defendants' pending dispositive motion, plaintiffs expressed their intent to abandon their third (Section 1983 claim for illegal search and seizure in alleged violation of Gonzalez' Fourth Amendment rights), sixth (Oregon common law claim for assault on Gonzalez), seventh (Oregon common law claim for battery of Gonzalez), eighth (Oregon common law claim for intentional infliction of emotional distress on Gonzalez), eleventh (Oregon common law claim for intentional infliction of emotional distress on Guzman), fourteenth (Oregon common law claim for intentional infliction of emotional distress on Vladimir), and nineteenth (Oregon common law claim for intentional infliction of emotional distress on Johnny) enumerated claims, and at oral argument indicated their intention

Page 14 - FINDINGS AND RECOMMENDATION

not to pursue their tenth (Section 1983 claim for illegal search and seizure in alleged violation of

Guzman's Fourth Amendment rights),[4] fifteenth (Oregon common law claim for assault on

Vladimir), sixteenth (Oregon common law claim for battery of Vladimir), twentieth (Oregon

common law claim for assault on Johnny), and twenty-first (Oregon common law claim for

battery of Johnny) enumerated claims for relief.  In connection with their opposition to

defendants' dispositive motion, plaintiffs offered no argument or evidence in support of any of

those twelve claims.  Analysis indicates that defendants' motion is in any event well taken as to

those twelve claims.  In consequence, plaintiffs' third, sixth, seventh, eighth, tenth, eleventh,

fourteenth, fifteenth, sixteenth, nineteenth, twentieth, and twenty-first claims should be dismissed

with prejudice.

## II.    Plaintiffs' Informal Motion for Judicial Notice

Plaintiffs request that the court take judicial notice that all charges against Gonzalez

arising out of the evidence seized from the Gonzalez family's home on February 4, 2010, were

dropped on May 13, 2010.  The subject information is a fit matter for judicial notice, *see* Fed. R.

Evid. 201(b), and supported by plaintiffs' evidentiary proffer; defendants do not oppose plaintiffs'

request.  I therefore grant plaintiffs' request and take notice that all criminal charges against

Gonzalez were dropped on May 13, 2010.

## III.    Defendants' Motion (#85) to Strike

Defendants move that the following evidence and argument, offered by plaintiffs in

support of their opposition to defendants' dispositive motion, be stricken from the record:  two

---

[4] This claim is the last remaining claim arising out of the February 4, 2010, search of the
Gonzalez family's home.

newspaper articles detailing conflicts Monico has had with the City of Cornelius over the course

of his employment by the Cornelius Police Department, advertisements for the sale of cascarilla,

two sentences of "argument" from plaintiffs' briefing in which counsel for plaintiffs appears to be

offering her own testimony regarding the type of paper cups in which cascarilla is sometimes

sold, and evidence and argument regarding a NIK Narcotics "G" Field Drug Test conducted by

Monico on a substance identified by plaintiffs' counsel as cascarilla during the course of

Monico's deposition.

Federal Civil Procedure Rule 12(f) permits the courts to "strike *from a pleading* an

insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R.

Civ. P. 12(f) (emphasis supplied); *see also, e.g., Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d

880, 885 (9th Cir. 1983) ("[u]nder the express language of the rule, only pleadings are subject to

motions to strike"); *United States v. Crisp*, 190 F.R.D. 546, 550 (E.D. Cal. 1999) ("[a] motion to

strike is limited to pleadings").  Plaintiffs' proffered evidence and argument are not contained

within a pleading.  As such, the evidence is outside the scope of what may be stricken pursuant to

Rule 12(f).

Moreover, there is no evident reason for the court to exercise its inherent power to control

its docket by striking the subject evidence or argument.  Inadmissible material and/or improper

argumentation contained in any document offered into evidence by either party should be (and

has been) disregarded by the court.

For the foregoing reasons, defendants' motion to strike is denied.

## IV.    Defendants' Motion (#64) for Summary Judgment

By and through their motion for summary judgment, defendants seek summary

adjudication of each of plaintiffs' remaining claims. The claims that remain at issue are, as noted above, the following: (i) plaintiffs' first enumerated claim, alleging Monico's liability under Section 1983 for arrest without probable cause in violation of Gonzalez' Fourth Amendment rights; (ii) plaintiffs' second enumerated claim, alleging Monico's liability under Section 1983 for malicious prosecution in violation of Gonzalez' Fourth and/or Fourteenth Amendment rights; (iii) plaintiffs' fourth enumerated claim, alleging Monico's liability under Section 1983 for violation of Gonzalez' right to substantive due process under the Fourteenth Amendment; (iv) plaintiffs' fifth enumerated claim, alleging the City of Cornelius' liability under Oregon common law for malicious prosecution of Gonzalez; (v) plaintiffs' ninth enumerated claim, alleging Monico's liability under Section 1983 for violation of Guzman's right to substantive due process under the Fourteenth Amendment; (vi) plaintiffs' twelfth enumerated claim, alleging Monico's liability under Section 1983 for arrest without probable cause in violation of Vladimir's Fourth Amendment rights; (vii) plaintiffs' thirteenth enumerated claim, alleging Monico's liability under Section 1983 for violation of Vladimir's right to substantive due process under the Fourteenth Amendment; (viii) plaintiffs' seventeenth enumerated claim, alleging Monico's liability under Section 1983 for arrest without probable cause in violation of Johnny's Fourth Amendment rights; and (ix) plaintiffs' eighteenth enumerated claim, alleging Monico's liability under Section 1983 for violation of Johnny's right to substantive due process under the Fourteenth Amendment. Of these, three (plaintiffs' first, second, and fifth enumerated claims) arise out of Gonzalez' arrest, and the remainder arise out of the removal of Vladimir and Johnny from their parents' custody.

Each of plaintiffs' eight claims against Monico is brought under 42 U.S.C. § 1983. Section 1983 provides a cause of action for plaintiffs subjected to deprivation of civil rights

under color of state law, where such rights are guaranteed either under the United States

Constitution or under federal law. *See* 42 U.S.C. § 1983; *see also Coral Constr. Co. v. King*

*County*, 941 F.2d 910, 926 (9th Cir. 1991) ("Section 1983 provides a private cause of action for

deprivations of federal rights under color of state law"). It is undisputed here that at all material

times Monico acted under color of state law. Therefore, the only issues that the court must now

resolve in connection with the eight Section 1983 claims against Monico are whether there is any

question of fact as to whether Monico's conduct caused a deprivation of any guaranteed civil

right of the plaintiff in question, and, if so, whether Monico enjoyed qualified immunity as to the

conduct that caused such deprivation.

**A.    Claims Arising Out of Gonzalez' Arrest (Plaintiffs' First, Second, and Fifth Enumerated Claims)**

**1.    Analysis of Probable Cause**

By and through their first enumerated claim, plaintiffs allege Monico's liability under

Section 1983 for arrest without probable cause in violation of Gonzalez' right under the Fourth

Amendment to be free from unreasonable seizure. It is well established that any arrest (or other

official seizure of a person by law enforcement officials having the essential attributes of a

formal arrest) is unreasonable for Fourth Amendment purposes if not supported by probable

cause. *See, e.g.*, *Mich. v. Summers*, 452 U.S. 692, 696-697, 700 (1981). It is undisputed here

that the seizure of Gonzalez on February 26, 2010, constituted a formal arrest by law

enforcement officials. The viability of plaintiffs' first enumerated claim thus turns on the

question whether Monico had probable cause to believe that Gonzalez was guilty of possession

of cocaine with intent to distribute at the time he effected Gonzalez' arrest.

By and through their second enumerated claim, plaintiffs allege Monico's liability under Section 1983 for malicious prosecution in violation of Gonzalez' right under the Fourth and/or Fourteenth Amendment to be free of intentional malicious prosecution in deprivation of the equal protection of the laws. Where such a claim may lie, it is governed by state law (here Oregon law). *See Usher v. Los Angeles*, 828 F.2d 556, 562 (9th Cir. 1987). By and through their fifth enumerated claim, plaintiffs allege the City's liability under Oregon common law for the tort of malicious prosecution. Under Oregon law, "[p]roof of probable cause is a complete defense" to a claim for malicious prosecution. *Gustafson v. Payless Drug Stores Northwest, Inc.*, 269 Or. 354, 356 (1974). The question whether Monico had probable cause to believe that Gonzalez was guilty of possession of cocaine with intent to distribute at the time he effected Gonzalez' arrest is thus squarely at issue in connection with both of plaintiffs' malicious prosecution claims as well.

The Oregon courts[5] "have adopted 3 Restatement, Torts § 662, as a correct statement of when probable cause exists." *Varner v. Hoffer*, 267 Or. 175, 179 (1973). The adopted section of the restatement provides that:

> One who initiates criminal proceedings against another has probable cause for so doing if he
>
> (a)    reasonably believes that the person accused has acted or failed to act in a particular manner, and
>
> (b)
>
>   (i)    correctly believes that such acts or missions constitute at common law or under an existing statute the offense charged against the accused, or

---

[5] "The lawfulness of a state arrest by state police is to be determined by state law so long as the state law is not inconsistent with the federal Constitution." *Bergstralh v. Lowe*, 504 F.2d 1276, 1277 (9th Cir. 1974), *citing Ponce v. Craven*, 409 F.2d 621, 625 (9th Cir. 1969).

> (ii)    mistakenly so believes in reliance on the advice of counsel
> under the conditions stated in § 666.

*Id.*, *quoting* Section 662, 3 Restatement, Torts, at 403-404.  To have probable cause for an arrest under Oregon law, the arresting officer must have "both a reasonable belief in the guilt of the accused as well as a subjective belief."  *Gustafson*, 269 Or. at 357, *citing Hryciuk v. Robinson*, 213 Or. 542, 561 (1958).

In the written materials supporting defendants' motion, defendants rely exclusively on the following in support of their position that Monico had both the subjective belief and objective reason to believe that Gonzalez was guilty of possession of cocaine with intent to distribute:  the discovery in Guzman's dresser drawer of white powder in a baggie together with small paper cups, the results of the two field tests on the white powder, Gonzalez' purported "admission" that the white powder was his own cocaine rather than cascarilla, the presence of a baggie of marijuana (in connection with which no charges ever issued) in Gonzalez' room, a "shrine" to Santa Muerte in Gonzalez' house, the presence of a financial ledger in the house, the presence of red objects in the house, the bloody sweatshirt and 9 millimeter cartridge, and one or more children's notebooks with "gang-related" writing on them.  For the reasons that follow, I conclude that a finder of fact could reasonably find that Monico lacked either subjective belief or objective reason to believe in Gonzalez' guilt, or both, and therefore conclude that defendants have not established for purpose of the dispositive motion now before the court that Monico had probable cause for arresting or initiating criminal proceedings against Gonzalez.

The presence of a small baggie of marijuana in Gonzalez and Guzman's bedroom, while indicative that Gonzalez, Guzman, or both were consumers of marijuana, is without significant

bearing on the question whether Gonzalez was a trafficker in cocaine or other white-powder drugs. The so-described shrine to Santa Muerte likewise is without bearing on the probable cause question. If the financial ledger had in fact contained indicia of drug-related transactions or of coded or deceptive book-keeping, it might have been suggestive of criminal activity, but in fact the evidence of record strongly suggests that the financial ledger appeared on its face to be what in fact it was: a record of the Gonzalez family's licit household debts and efforts to repay them. The red objects and decor in the Gonzalez family's home, the sweatshirt stained with an unidentified person's blood, the single 9 millimeter cartridge, and the children's notebooks are entirely irrelevant to the question of Gonzalez' putative involvement in cocaine trafficking.

Without more, the discovery of white powder arguably resembling cocaine or another white-powder drug in a plastic baggie in a dresser drawer could, by contrast, be sufficient to support defendants' probable cause theory. Notwithstanding any questions as to Monico's correct understanding of the NIK Narcotics "G" Field Drug Test and any question as to the gravamen of the results obtained from Monio's field test or tests of the seized powder,[6] the evidence of record is that Monico believed in good faith that he had performed the test correctly and that the results were indicative of the presence of cocaine (perhaps in a diluted form). The field test or tests therefore do not require any contrary conclusion. However, Monico's testimony that Gonzalez "confessed" to him that the substance was his own "old" and "forgotten" cocaine, and his express

---

[6] I note that Monico's testimony that he performed an initial field test of the substance discovered in the baggie before leaving the Gonzalez family's home is uncorroborated by any other physical or testimonial evidence of record. In light of the grounds, discussed below, for doubting Monico's credibility as a witness, a finder of fact could reasonably conclude on the evidence of record that the first of the two field tests described in Monico's testimony never took place.

reliance thereon in obtaining a warrant for Gonzalez' arrest, does significantly alter the analysis.

Gonzalez has consistently taken the position that he never told Monico that the substance was cocaine, but rather told him only that the substance was cascarilla. In light of the now established and undisputed fact that the seized substance was not cocaine, the accuracy of Monico's testimony to the contrary and his good faith in purportedly subjectively relying on Gonzalez' "confession" in obtaining an arrest warrant are called into very serious question. It is highly implausible that Gonzalez would confess to law enforcement officials that a powder he knew to be cascarilla was in fact a controlled substance. On the current evidentiary record, I therefore conclude that a finder of fact could reasonably determine that Gonzalez did not confess in the manner testified to by Monico under oath, and that Monico entirely fabricated his account of Gonzalez' confession.

At oral argument in support of their motion, defendants for the first time advanced the proposition that for purposes of conducting its probable cause analysis, the court must set aside any "false statements" Monico may have relied upon in seeking a warrant for Gonzalez' arrest, and determine whether probable cause could have lain in the remaining relied-upon evidence. In fact, when determining whether evidence uncovered in the course of a search undertaken pursuant to a warrant must be excluded from trial in light of false statements contained in the warrant affidavit, the procedure described by defendants is appropriate:

> [W]here [a criminal] defendant makes a substantial preliminary showing that a
> false statement knowingly and intentionally, or with reckless disregard for the
> truth, was included by the affiant in the warrant affidavit, and if the allegedly false
> statement is necessary to the finding of probable cause, the Fourth Amendment
> requires that a hearing be held at the defendant's request. In the event that at that
> hearing the allegation of perjury or reckless disregard is established by the
> defendant by a preponderance of the evidence, and, with the affidavit's false

> material set to one side, the affidavit's remaining content is insufficient to
> establish probable cause, the search warrant must be voided and the fruits of the
> search excluded to the same extent as if probable cause was lacking on the face of
> the affidavit.

*Franks v. Delaware*, 438 U.S. 154, 155-156 (1978); *see also, e.g., United States v. Craighead*,

539 F.3d 1073, 1080 (9th Cir. 2008) (to same effect). However, I am aware of no precedential

authority for the proposition that a warrant affiant's election to offer false testimony in support of

an arrest warrant must be excluded from consideration when determining whether the affiant

harbored a good-faith subjective belief in the guilt of the person to be arrested. Indeed, I disagree

that any such procedure could be appropriate as a matter of law on the facts presented here.

Monico's fabrication of an invented confession to the crime for which Gonzalez was arrested is

clearly material to the question of Monico's subjective belief in Gonzalez' guilt. Moreover, if a

finder of fact concluded that Monico fabricated his account of Gonzalez' confession, and further

concluded in consequence that all of Monico's uncorroborated testimony was without credibility,

the finder of fact could reasonably conclude that the results of Monico's field test or field tests

did not indicate at any time that the substance in the baggie was cocaine, such that Monico at all

material times lacked objective grounds for believing in Gonzalez' guilt.

Monico's subjective belief in Gonzalez' guilt and objectively reasonable grounds for

belief in Gonzalez' guilt are each essential elements of probable cause. *See Gustafson*, 269 Or. at

357. Because on the current evidentiary record a finder of fact could reasonably conclude that

each element was at all material times lacking, I find that, for purposes of the dispositive motion

now before the court, defendants have not established probable cause for Gonzalez' arrest.

2.      **Plaintiffs' First Enumerated Claim:  Section 1983 Claim Alleged Against Monico for Arrest Without Probable Cause**

In consequence of the foregoing analysis of probable cause, defendants have failed to establish their entitlement to judgment as a matter of law in connection with plaintiffs' first enumerated claim for relief on the grounds that Gonzalez did not suffer any deprivation of any constitutionally protected civil right when Monico effected his arrest.  I address Monico's argument that he is nevertheless entitled to qualified immunity in connection with Gonzalez' arrest below.

3.      **Plaintiffs' Second Enumerated Claim:  Section 1983 Claim Alleged Against Monico for Malicious Prosecution**

With certain exceptions, a claim of malicious prosecution will not lie under Section 1983:

> In this circuit, the general rule is that a claim of malicious prosecution is not cognizable under 42 U.S.C. § 1983 if process is available within the state judicial system to provide a remedy.  *Bretz v. Kelman*, 773 F.2d 1026, 1031 (9th Cir. 1985) (*en banc*); *Cline v. Brusett*, 661 F.2d 108, 112 (9th Cir. 1981).  However, "an exception exists to the general rule when a malicious prosecution is conducted with the intent to deprive a person of equal protection of the laws or is otherwise intended to subject a person to a denial of constitutional rights."  *Bretz*, 773 F.2d at 1031; *Cline*, 661 F.2d at 112.

*Usher v. Los Angeles*, 828 F.2d 556, 561-562 (9th Cir. 1987).  The *Usher* court applied the described *Bretz* "exception" as follows:

> In his complaint, Usher alleged that the defendants illegally arrested him, contrived charges to justify the arrest, submitted false police reports and initiated his criminal prosecution in bad faith.  Further, Usher contends that the police officers called him "nigger" and "coon" -- references which, as we have noted, are sufficient to demonstrate racial animus -- and that they acted pursuant to official policy, practice or custom.  The criminal proceeding against Usher was terminated in his favor, by a dismissal for lack of evidence.  Read liberally as they must be, Usher's pleadings fairly bring his common law tort claim of malicious prosecution within the scope of section 1983, under the exception for a malicious prosecution intended to deprive a person of the equal protection of the laws.

*Id.* at 562.

Here, plaintiffs have offered evidence that Monico fabricated evidence and submitted false police reports in order to obtain a warrant for Gonzalez' arrest, and that Monico's conduct in returning to the Gonzalez family's home after the search on February 4, 2010, was motivated by a specific animus against Gonzalez. The Gonzalez family's proffered evidence that Monico may have intended to initiate criminal proceedings against Gonzalez without regard to Gonzalez' guilt or innocence is sufficient for purposes of the dispositive motion now before the court to invoke the *Bretz* exception, pursuant to which a constitutional malicious prosecution claim may lie under Section 1983. As noted above, where such a claim may lie, it is governed by Oregon law. *See id.* at 562.

> Under Oregon law, the elements of a malicious prosecution claim are as follows:
>
> (1) the institution or continuation of the original criminal proceedings; (2) by or at the insistence of the defendant; (3) termination of such proceedings in the plaintiff's favor; (4) malice in instituting the proceedings; (5) lack of probable cause for the proceeding; and (6) injury or damage because of the prosecution.

*Blandino v. Fischel*, 179 Or. App. 185, 190-191 (2002).

Here, defendants argue that they are entitled to summary judgment on plaintiffs' constitutional malicious prosecution claim on only two grounds: that the claim is "preempted" by state malicious prosecution law, and that Monico had probable cause for instituting criminal proceedings against Gonzalez ("[p]roof of probable cause is a complete defense" to a claim for malicious prosecution," *Gustafson*, 269 Or. at 356). I have already noted that, under *Bretz* and *Usher*, the existence of a state-law remedy for malicious prosecution is not a barrier to maintenance of plaintiffs' constitutional malicious prosecution claim, and have already found that

defendants have failed to establish probable cause for Gonzalez' arrest and the institution of criminal proceedings against him. Moreover, it is undisputed that criminal proceedings were instituted against Gonzalez on the basis of reports filed by Monico and that those proceedings terminated in Gonzalez' favor, and plaintiffs have offered evidence of Monico's "malice" in instituting the proceedings (fabrication of Gonzalez' "confession" and conduct displaying animus toward Gonzalez) and that Gonzalez suffered damage as a result (forcible separation from his family and minor children). In consequence, defendants are not entitled to summary judgment on plaintiffs' second enumerated claim on the grounds that Gonzalez suffered no constitutional deprivation in consequence of Monico's conduct in instituting criminal proceedings against him. I address Monico's argument that he is nevertheless entitled to qualified immunity in connection with the institution of criminal proceedings against Gonzalez below.

### 4.   Qualified Immunity in Connection with Plaintiffs' First and Second Enumerated Claims

Monico asserts qualified immunity in connection with plaintiffs' Section 1983 claims against him. The United States Supreme Court has described the qualified immunity doctrine as follows:

> The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.

*Pearson v. Callahan*, 555U.S. 223, 129 S. Ct. 808, 815 (2009) (citations, internal quotation

marks omitted).

The qualified immunity analysis consists of two steps. One step analyzes whether a constitutional right was violated, while the other examines whether the right was clearly established. Following *Pearson*, the courts are permitted to perform these steps in whichever order is more appropriate under the circumstances of the case, considering the development of the facts and legal issues in the record before the court and the stage of proceedings at which the qualified immunity issue is examined. *See Pearson*, 129 S. Ct. at 818. Here, I have found that defendants have not established the absence of any violation of Gonzalez' constitutional rights. The question remaining for determination is whether Gonzalez' rights were clearly established at the time the deprivations occurred.

Because the complained-of deprivations in connection with plaintiffs' first and second enumerated claims were effected in part through the fabrication of false evidence, and because the impropriety of such fabrication and of reliance on such fabrication for the arrest of or institution of criminal proceedings against a suspect is well established, *see, e.g.*, *Olson v. Tyler*, 825 F.2d 1116, 1121 (7th Cir. 1987), *Malley v. Briggs*, 475 U.S. 335, 346 n. 9 (1986), *Smiddy v. Varney*, 665 F.2d 261, 267 (9th Cir. 1981), it is clear that Monico may not rely on qualified immunity to escape liability on these claims. In consequence, defendants' motion for summary judgment should be denied as to plaintiffs first and second enumerated claims.

**5.      Plaintiffs' Fifth Enumerated Claim: Oregon Common Law Claim Alleged Against the City for Malicious Prosecution**

By and through their fifth enumerated claim for relief, plaintiffs allege the City's liability for malicious prosecution of Gonzalez, premised on the same institution of criminal proceedings

against Gonzalez discussed above. In support of their motion for summary judgment against plaintiffs' common-law malicious prosecution claim, defendants rely on the same arguments offered in support of their motion against plaintiffs' constitutional malicious prosecution claim, and offer no evidence that the City should not be found vicariously liable for Monico's actions on a *respondeat superior* theory. In consequence, and for the same reasons discussed above, defendants are not entitled to summary judgment as a matter of law on plaintiffs' fifth enumerated claim for relief.

### B. Claims Arising Out of the Removal of Vladimir and Johnny from Their Parents' Custody (Plaintiffs' Fourth, Ninth, Twelfth, Thirteenth, Seventeenth, and Eighteenth Enumerated Claims)

#### 1. Plaintiffs' Fourth, Ninth, Thirteenth, and Eighteenth Enumerated Claims: Section 1983 Claims Alleged Against Monico Respectively for Violation of Gonzalez' Guzman's, Vladimir's and Johnny's Substantive Due Process Rights

By and through their fourth, ninth, thirteenth, and eighteenth enumerated claims (collectively, plaintiffs' "substantive due process claims"), plaintiffs allege Monico's liability under Section 1983 for the violation of, respectively, Gonzalez' Guzman's, Vladimir's, and Johnny's substantive due process rights under the Fourteenth Amendment in connection with Monico's involvement in the removal of Vladmir and Johnny from their parents' custody by DHS on February 25, 2010.

It is well established in the Ninth Circuit that both parents and children may challenge the state's severance of the parent-child relationship by removing minor children from parental custody under Section 1983 where such severance fails to comport with the substantive due process rights guaranteed under the Fourteenth Amendment. *See Morrison v. Jones*, 607 F.2d

1269 (9th Cir. 1979); *Smith v. City of Fontana*, 818 F.2d 1411, 1418-1420 (9th Cir. 1987).

Indeed, "[t]he constitutional right of parents and children to live together without governmental

interference is well established [and t]he Fourteenth Amendment guarantees that parents will not

be separated from their children without due process of law except in emergencies."[7] *Mabe v.*

*San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107 (9th Cir. 2001). The

questions for the court's determination here, therefore, are whether Monico played a causal role

in the removal of Vladimir and Johnny from their parents' custody by Oregon DHS and, if so,

whether Monico's involvement in the removal comported with the Gonzalez family's substantive

due process rights.

Defendants' primary argument in opposition to plaintiffs' substantive due process claims

is that Monico was not involved in the removal of Vladimir and Johnny from the Gonzalez

family's home other than by forwarding his police report to DHS officials in compliance with his

statutory duty to report "suspected child abuse." Indeed, defendants offer Monico's testimony

that he was not present during the removal, but plaintiffs offer the testimony of DHS employee

and former defendant Wuthrich that Monico was in fact present, and this court must resolve that

factual dispute in plaintiffs' favor under Federal Civil Procedure Rule 56. However, this line of

argumentation is largely a red herring, because the gravamen of the substantive due process

claims is not that Monico should be held liable for physically implementing the removal of the

children, but rather that he should be found liable based on his conduct in knowingly forwarding

a report to DHS that contained false information tending to suggest that Gonzalez was involved

---

[7] There is no evidence here that Vladimir and Johnny were removed from their parents'
custody on grounds of imminent danger to their safety or other circumstances constituting
emergency.

in cocaine trafficking, with the knowledge that his false testimony might result in the removal of the children.

I agree with the plaintiffs that the evidentiary record creates at least a question of fact as to whether Monico could be found liable for violation of the Gonzalez family's substantive due process rights. The removal of children from their parents' custody on the basis of fabricated evidence is an arbitrary and conscience-shocking deprivation of parents' protected custodial interest in their children and of both parents' and childrens' protected interests in their mutual companionship and society. *See, e.g., Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1110-1114 (9th Cir. 2009).

Monico asserts qualified immunity in connection with plaintiffs' substantive due process claims. As discussed above, it is clear in the contexts of arrest and/or institution of criminal proceedings that a law enforcement official is not entitled to qualified immunity in connection with the knowing fabrication of evidence. However, *Costanich* stands for the proposition that, as of December 3, 2010 (the date the *Costanich* decision issued), the right to continued enjoyment of the parent-child relationship free of governmental interference premised on fabricated evidence was not yet clearly established:

> [G]iven the distinctions between criminal prosecutions and civil foster care proceedings, we cannot say that this right was clearly established as of 2001, when the conduct at issue in this case occurred. The special duties of prosecutors and the unique interests at stake in a criminal action do not parallel the duties and interests at stake in a civil child custody proceeding. Washington's "paramount concern" for safeguarding and protecting the health and safety of foster children, for example, places a special duty on DSHS officials to vigorously investigate allegations of child abuse. *See, e.g.*, Wash. Rev. Code §§ 13.34.020, 74.13.010, 74.13.031(3). Furthermore, it is clear that Washington foster care licensees' and custodial guardians' interests do not rise to the level of a criminal defendant's interests, which are clear and long-established. **While these factors do not**

> **excuse deliberate fabrication of evidence, there are sufficient distinctions between criminal prosecutions and civil foster care proceedings that the right had not yet been clearly established in the civil context.**

*Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1115-1116 (emphasis supplied). The court specified that "going forward, reasonable government officials are on notice that deliberately falsifying evidence in a child abuse investigation and including false evidentiary statements in a supporting declaration violates constitutional rights where it results in the deprivation of liberty or property interests, be it in a criminal or civil proceeding," *id.* at 1115, but as of February 25, 2010 – prior to issuance of the *Costanich* opinion – *Costanich* teaches that the Gonzalez family's relevant substantive due process rights were not yet clearly established.

In consequence, under *Pearson, supra*, Monico is entitled to qualified immunity on plaintiffs' substantive due process claims. Defendants' motion should therefore be granted as to plaintiffs' fourth, ninth, thirteenth, and eighteenth enumerated claims.

### 2.   Plaintiffs' Twelfth and Seventeenth Enumerated Claims: Section 1983 Claims Alleged Against Monico Respectively for Arrest of Vladimir and of Johnny without Probable Cause

By and through their twelfth and seventeenth enumerated claims, plaintiffs allege Monico's liability under Section 1983 for the violation of, respectively, Vladimir's and Johnny's rights under the Fourth Amendment to be free of arrest without probable cause, such claims arising out of Monico's involvement in the removal of Vladmir and Johnny from their parents' custody by DHS on February 25, 2010. Because these claims are, like plaintiffs' substantive due process claims, premised on the wrongfulness of Monico's conduct in knowingly forwarding a report to DHS that contained false information tending to suggest that Gonzalez was involved in cocaine trafficking, and because under *Costanich, supra*, Monico is entitled to qualified

immunity in connection with that conduct, the court need not determine whether the removal of Vladimir and Johnny from their parents' custody by DHS constitutes an "arrest" for purposes of the Fourth Amendment. Under *Costanich* and *Pearson*, *supra*, Monico is entitled to qualified immunity on plaintiffs' claims for the arrest of Vladimir and of Johnny without probable cause. Defendants' motion should therefore be granted as to plaintiffs' twelfth and seventeenth enumerated claims.

## CONCLUSION

For the reasons set forth above, plaintiffs' third, sixth, seventh, eighth, tenth, eleventh, fourteenth, fifteenth, sixteenth, nineteenth, twentieth, and twenty-first enumerated claims for relief should be dismissed with prejudice, plaintiffs' informal motion for judicial notice is granted as discussed above, defendants' motion (#85) to strike is denied, and defendants' motion (#64) for summary judgment should be granted as to plaintiffs' fourth, ninth, twelfth, thirteenth, seventeenth, and eighteenth enumerated claims for relief and denied as to plaintiffs' first, second, and fifth enumerated claims for relief.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a

/ / /

/ / /

/ / /

Page 32 - FINDINGS AND RECOMMENDATION

copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings

and Recommendation will go under advisement.

Dated this 10th day of April, 2013.

Honorable Paul Papak
United States Magistrate Judge